UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Renee Schroeder,

      Plaintiff,                        **MEMORANDUM OPINION
AND ORDER**

v.                                 Civil No. 19-1836 (MJD/TNL)

Axel H. Ohman, Inc.

      Defendant.

---

Leslie L. Lienemann and Celeste E. Culberth, Culberth & Lienemann, LLP, Counsel for Plaintiff.

Lars C. Erickson and Benjamin J. Kirk, The Coleman Law Firm, LLC, Counsel for Defendant.

---

This matter is before the Court on Defendant Axel H. Ohman, Inc.'s ("Axel") motion for summary judgment. (Doc. No. 28)

## I.    Background

Axel is a concrete/masonry contractor in Minneapolis, Minnesota that is owned by Pete Peschel. (Erickson Aff., Ex. A (Peschel Dep. at 32-33).) Concrete construction is seasonal as concrete does not cure properly in cold temperatures, therefore layoffs are commonplace in the industry. (Id. Ex. C (Fowler Dep. at 24-27); Ex. D (Harrison Dep. at 14).) As the cold weather approaches, Axel slowly

reduces its workforce to its most skilled and diverse workers.  (Id. Ex. A (Peschel Dep. at 16); Ex. C (Fowler Dep. at 12).)  Axel assigns jobs based on skill level, general proximity to their home when possible and physical ability.  (Id. Ex. G (Cacka Dep. at 9, 43-45).)  Employees that are laid off for a long period of time are told to apply for unemployment and to look for other work.  (Id. Ex. H (Perron Dep. at 21).)

Plaintiff was employed by Axel as a laborer from November 2014 to December 2018.  (Id., Ex. I (Schroeder Dep. at 80); Second Supp. Perron Aff. at ¶ 9.)  Prior to her hire, Plaintiff had no experience in concrete construction.  (Id. Ex. I (Schroeder Dep. at 10).)  Her boyfriend, Jamie Friebel, was a carpentry foreman at Axel and helped her get a job at Axel.  (Id. Ex. J (Friebel Dep. at 5-6).)  Because of her size and lack of experience, she was limited as to what jobs she could perform.  (Id. Ex. H (Perron Dep. at 29-34, 76); Ex. J (Friebel Dep. at 96).)

Throughout her employment at Axel, Plaintiff was typically laid off in December or January, was rehired when the weather improved and worked the construction season until cold weather prevented further work.  (Id. Ex. K (Plaintiff's 2014-2016 Time Entries); Ex. M (Axel Certified Payroll for Renee

Schroeder from June 2017 through December 2018); Second Supp. Perron Aff. at ¶¶ 5-8.)

Plaintiff alleges that she was subjected to harassment by a co-worker, John Hayes.  She further alleges she was subjected to discrimination and harassment based on her gender by foreman Brian Maas.  Plaintiff alleges that Maas didn't believe women should work in the industry, and that he continually berated her, failed to give her direction and refused to record her time on projects when he was foreman.  (Id. Ex. I (Schroeder Dep. at 69-71).)  She repeatedly reported Maas' conduct to Perron, who stated he would take care of it, but that Maas continued to mistreat Plaintiff and failed to include her time on the time sheets. (Id. at 82.)

Plaintiff also claims that certain workers would watch porn during work and send each other sexually explicit photos on their phones.  (Id. at 93.)  Plaintiff did not report this behavior, however.  (Id. at 96.)  Plaintiff also heard that Axel's foremen did not want to work with her because she was a woman.  (Plaintiff Decl. at ¶ 4.)

The first alleged incident of harassment involving Hayes occurred in the spring of 2016 at the Catholic Charities/Higher Ground Project, and involved Hayes telling Plaintiff that he could "see her tits" and that Hayes wanted to "screw" Rhonda from Bolandar.  (Id., Ex. I (Schroeder Dep. at 17, 118, 185).)

Later that summer, Plaintiff was working at the Rosedale Ramp Expansion Project when Hayes approached her and co-worker Tom Kappes while the two were bending pencil rod and made a number of inappropriate comments such as: "you like it bent over," "I bet you can't handle eight inches," "I would show you, but I don't want to hurt you," "I've got a dick I can show you", "You get pleasure out of this," and "She [another female employee] had a nice ass."  (Id. at 17, 184-195.)  When asked about this incident, Kappes recalled working with Plaintiff at the Rosedale Ramp project, and that when they were discussing the best way to bend pencil rod, Hayes approached and said, "You guys are talking dirty."  (Id. Ex. EE (Kappes Aff. at ¶ 5).)

In May 2017, while working at DCTC, Plaintiff alleges that when in a back room of the building, Hayes asked her "oh, Renee, what can we do back here?" (Id. Ex. I (Schroeder Dep. at 121).)  Hayes is also alleged to have said to Plaintiff

"Renee, are you a plumber, or are you giving me an invite" after she had bent over and her backside was exposed.  (<u>Id.</u> at 189.)

Plaintiff further alleges that in May 2017, she was working at the Moxy Hotel when Hayes told her that he was able to see a female co-worker's crotch, and that he wanted to screw that co-worker.  (<u>Id.</u> at 121-22 and 192.)

The final alleged incident took place at the Holman Field project on June 9, 2017.  Plaintiff claims that a concrete truck was pouring too quickly, and that Hayes grabbed a rake out of her hands and shouted at her, telling her she was dumb and that she shouldn't be working that job.  (<u>Id.</u> at 21.)  Earlier that day, Plaintiff also heard Hayes talking with other male employees about getting into another woman's pants.  (<u>Id.</u> at 22.)  Plaintiff further alleges that Hayes made a number of inappropriate comments to her such as "You know I got a big dick," "That's not a sock I got in there.  That's my real bulge," and "Do you want to look at it?" (<u>Id.</u> at 195-96.)

After work that day, Plaintiff went home and was very upset; she was crying and was sick to her stomach.  (<u>Id.</u> at 14.)  Her boyfriend, Friebel, asked her what was wrong, and she told him about the harassment she experienced that day from Hayes, as well as the other incidents that occurred starting in 2016.

(Id.)  Friebel then called Axel President Pete Peschel to tell him of the harassment

Plaintiff experienced from Hayes.  (Id. at 13, 19.)  Later in the conversation,

Peschel asked to speak with Plaintiff to find out what had happened.  (Id.)

Peschel put his phone on speaker so that Lance Perron, Axel Field Supervisor,

could participate in the call.  (Id. Ex. H (Perron Dep. at 39).)

Plaintiff then related her experiences of harassment by Hayes to Peschel and

Perron.  (Id. at 41; Ex. I (Schroeder Dep. at 24).)

      After speaking with Plaintiff, Peschel told Perron to call Hayes to get his

side of the story.  (Id. Ex. H (Perron Dep. at  43).)  Peschel then talked to Hayes

on speaker, with Perron present, about Plaintiff's claims of harassment.  (Id. at

46.)  During the call, Hayes denied making any sexual comments to Plaintiff.

(Id.)  Peschel reminded Hayes of the company's policy on sexual harassment and

warned him that he would be terminated if he were found to break that policy.

(Id. Ex. DD (Hayes Aff. at ¶ 5); Ex. A (Peschel Dep. at 42).)  Peschel then called

the foreman at the Holman Field project and asked whether he witnessed Hayes

making any inappropriate comments to Plaintiff that day.  (Id. Ex. A (Peschel

Dep. at 47).)  The foreman responded that he did not see or hear anything about

any harassment.  (Id.)

Peschel then called Plaintiff back and told her Hayes was denying the allegations, but that he was going to fire him anyway.  (<u>Id.</u>, Ex. I (Schroeder Dep. at 27).)  Plaintiff asked Peschel not to let anybody know about her report on Hayes, and he agreed.  (<u>Id.</u>)  In the meantime, Peschel told Perron to keep Hayes separated from Plaintiff and Friebel.  (<u>Id.</u> Ex. H (Perron Dep. at 49).)  Plaintiff claims the following Monday[1], however, Plaintiff and Friebel finished a job early, and were assigned to a project that Hayes was working on.  (<u>Id.</u> Ex. I (Schroeder Dep. at 28).)  Plaintiff further claims that Hayes "flipped out" when she got to the site, and that he called Perron and asked, "Why is that bitch here, and how come you fucking sent her and Jamie here the next Monday?"  (<u>Id.</u>)

Perron testified that assigning Plaintiff and Hayes to the same project was a mistake, as he was managing 100 employees and that it was hard to always keep track of employee assignments.  (<u>Id.</u> Ex. H (Perron Dep. at 50).)  When Peschel visited the work site and saw the two working there, he claims he apologized to both Friebel and Plaintiff, and asked if they wanted to be sent to another project.  (<u>Id.</u> Ex. A (Peschel Dep. at 60-62).)  They both indicated they would work out the day where they were.  (<u>Id.</u>)

---

[1] Payroll records indicate the day Hayes and Plaintiff were mistakenly assigned to the same job site was on June 20, 2017.  (<u>Id.</u> Exs. M and P.)

There were other occasions when Plaintiff and Hayes were assigned to the same job site.  (Id. Exs. M and P.)  Perron testified that for two of those occasions, Plaintiff was notified ahead of time and told the only jobs available would require her to work with Hayes and she was asked if she was willing to work on those jobs.  (Id. Ex. H (Perron Dep. at 50).)  Perron admitted that Plaintiff was also mistakenly assigned to a job site with Hayes in July 2018 without notifying her ahead of time.  (Id.; Exs. M and P.)

Plaintiff alleges that following her report of the harassment, she suffered several adverse actions at work, including being shunned, denied work, having her work sabotaged and forced to work alone.  (Id. Ex. I (Schroeder Dep. at 31-32, 37-41, 43, 49).)  Friebel also felt he was working in a hostile environment once word of Plaintiff's report of harassment by Hayes got out.  (Id. Ex. J (Friebel Dep. at 77).)

In September 2017, a co-worker told Friebel that he had heard that Hayes could no longer work with Friebel.  (Id. at 19.)  Later, another co-worker commenting about Plaintiff, stated that "rumor has it you can't talk shit to your old lady or you'll get fired around here."  (Id.)   At that point, Friebel "had enough" and called Peschel to tell him to "fuck off."  (Id. at 20.)  Friebel admits

8

he was intoxicated at the time and made some comments that Peschel perceived as threats to his daughter.  (Id.)  After multiple calls, voice mail messages and text messages with Peschel that night, Friebel claims he quit his job.  (Id. at 5, 20-21.)  Axel sent Friebel a termination letter dated October 3, 2017, terminating his employment based on his conduct during the calls and the text messages the previous Friday.  (Id. Ex. HH (Termination Letter dated October 3, 2017).)

On October 11, 2107, Plaintiff reported the harassment to the Union.  (Id. Ex. F (Bubalo Dep. at 9).)  After speaking with Plaintiff, Business Agent Mike Bubalo spoke with Dan Cacka at Axel, who provided him more specifics as to Plaintiff's claims and reported they had addressed the situation by not scheduling Plaintiff and Hayes on the same projects.  (Id. at 15.)  On October 13, 2017, Bubalo left two voicemails for Plaintiff, but she did not call back.  (Id. at 30.)

In March 2018, Plaintiff called the Union again to file a grievance for sexual harassment, to request that Hayes be fired and to complain that she had not been called back to work when other employees with less seniority were called back.  (Id., Ex. C (Fowler Dep. at 22-24).)  On this occasion, she spoke with Joe Fowler, the Union Business Manager.  He recalled that Plaintiff did not report that the previously reported harassment continued, but that she wanted Hayes to be

fired.  (Id. at 24.)  Fowler followed up this call by speaking with Cacka and ultimately determined to close the file without filing a grievance on Plaintiff's behalf as the relevant union contract did not have a seniority requirement.  (Id. at 58.)

On April 17, 2018, Plaintiff filed a charge of discrimination with the EEOC, which was cross-filed with the Minnesota Department of Human Rights. (Lienemann Decl. Ex. 13.)  After Axel received notice of Plaintiff's EEOC charge, Plaintiff claims she was assigned to work alone with Hayes on a job site. (Plaintiff Decl. at ¶ 11.)  When she complained, she was sent home while Hayes was allowed to continuing working.  (Id.)  Plaintiff further claims that only after she filed her discrimination charge with the EEOC did Axel start to routinely assign her to job sites.  (Id. at ¶ 10.)

In December 2018, Peschel received an email from an individual named Christopher Schmidt.  (Lienemann Decl. Ex. 17.)  In the email, Schmidt told Peschel that Axel employees were bragging about smoking marijuana at work and that Plaintiff worked while under the influence of methamphetamine and marijuana.  (Id.)  He further stated that Plaintiff carried a clean bottle of urine in her car if she was subjected to a random drug test.  (Id.)  Finally, he stated that

Plaintiff was "bragging about how she is scamming your company for a sexual harassment lawsuit." (Id.)

Peschel spoke with Schmidt over the phone after receiving his email. (Erickson Aff., Ex. A (Peschel Dep. at 138).) He was on guard when he called, as he did not know Schmidt. (Id.) Schmidt explained that he was dating Plaintiff's sister, and that he and his girlfriend tried to stay away from Plaintiff and Friebel "because we – whenever we're kind of involved with the, it – it – things would go wrong." (Id.) Schmidt also told Peschel that he believed Plaintiff and Friebel were "in on it." (Id. at 139.) When deposed, Schmidt admitted that he made the accusations up because he was dating Plaintiff's twin sister at that time and was mad at Plaintiff for taking her sister to Florida and not returning. (Id. Ex. 10 (Schmidt Dep. at 10, 12).)

Plaintiff alleges that after talking with Schmidt, she was not assigned any more work at Axel. After Plaintiff was laid off in December 2018, she testified that she did work two days in January 2019. (Id., Ex. I (Schroeder Dep. at 57).) Thereafter, she texted Perron inquiring about work, but was never called back in. (Id.) In April 2019, she worked with American Restoration for a few weeks, and was then hired by B&D in May 2019. (Id. at 58-59.)

11

In her Complaint, Plaintiff has alleged claims of sexual harassment and reprisal in violation of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. 363A.01 *et seq* and sexual harassment and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq.*

## II.   Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).  The party opposing summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial.  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

III.    **Discussion**

A.    **Sexual Harassment/Hostile Environment Claims**

Both Title VII and the MHRA provide it is an unlawful employment practice to subject an employee to a hostile work environment based on that employee's membership in a protected group.  The elements of a hostile environment claim are: "(1) [Plaintiff] belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take proper remedial action."  Gibson v. Concrete Equipment Co., Inc., 960 F.3d 1057, 1063 (8th Cir. 2020); Goins v. West Group, 635 N.W.2d 717, 725 (Minn. 2001).

Under Title VII, to determine whether the harassment affected a term or condition of employment, a plaintiff "must demonstrate (1) that the environment was objectively hostile and (2) that she 'subjectively perceive[d]' the environment as 'abusive.'"  Id. (citing Duncan v. Gen. Motors Corp., 300 F.3d 928, 934 (8th Cir. 2002) ("[T]his fourth part of a hostile environment claim includes both objective and subjective components: an environment that a

reasonable person would find hostile and one that the victim actually perceived as abusive.")).

Claims under the MHRA are similarly analyzed.  Kenneh v. Homeward Bound, Inc., 944 N.W.2d 222, 230-31 (Minn. 2020)(rejecting employee's attempt to renounce federal severe-or-pervasive standard but clarifying that a MHRA sexual harassment claim must be considered on its facts, not on a purportedly analogous federal decision).   "[T]o determine whether the alleged conduct had the purpose or effect of substantially interfering with employment or creating an intimidating, hostile, or offensive employment environment, we consider 'whether the conduct was sufficiently severe or pervasive to objectively do so and whether the plaintiff subjectively perceived her employment environment to be so altered or affected.'"  Id. at 233 (quoting Rasmussen v. Two Harbors Fish Co., 832 N.W.23d 790, at 796–97 (2013)).  "Moreover, whether the alleged harassment was sufficiently severe or pervasive as to create a hostile work environment is 'generally a question of fact for the jury.'"  Id. at 232 (quoting Johnson v. Advocate Health & Hosps. Corp., 892 F3d. 887, 901 (7th Cir. 2018)).  "If a reasonable person could find the alleged behavior objectively abusive or

offensive, a claim is sufficiently severe or pervasive to survive summary

judgment."  Id.

Axel argues that, other than falling within a protected group, Plaintiff

cannot demonstrate any of the remaining elements of a hostile environment

claim; she cannot show the alleged conduct was unwelcome, that it was based on

sex, that the alleged conduct was severe or pervasive, and that Axel failed to take

appropriate remedial action.  To each of these assertions, however, the Court

finds genuine fact issues preclude summary judgment on Plaintiff's sexual

harassment claims.

For example, Axel claims that there is evidence that when co-worker Tom

Kappes was operating a nail gun, Plaintiff said to him "Nail me" and then

laughed.  (Erickson Aff. Ex. EE (Kappes Decl. ¶ 9).)  Plaintiff also complained

that a rumor had circulated that she had been a stripper, yet at her deposition,

she disseminated a similar rumor about a female co-worker, Kate Zelco.  (Id. Ex.

I (Schroeder Dep. at 16).)  Zelco has also reported that she was comfortable

working at Axel, and did not experience any inappropriate behavior, except by

plaintiff, who one day was bragging about her breast implants.  (Id. Ex. II (Jade

Holman Aff. at ¶¶ 11 and 12.)  Plaintiff told her she would also look good with a

boob job and asked her to expose herself.  (Id. at ¶ 12.)  When Zelco declined,

Plaintiff asked her if she wanted to see and feel Plaintiff's breasts.  (Id.)

Plaintiff denies making such comments to Zelco.  (Doc. No. 41 (Schroeder Decl.

at ¶ 15).)

Even if the above isolated events took place, the fact remains that Plaintiff

has repeatedly claimed that the harassment she experienced was unwelcome.

The record shows that when she reported the harassment to Peschel, she was

crying and was obviously upset.  (Lienemann Ex. 7 (Peschel Dep. at 76-77).)

Peschel further testified that if true, the reported statements made by Hayes were

offensive and/or inappropriate.  (Id. at 89-96.)  Friebel has also testified that

Plaintiff did not welcome the alleged harassment and abusive conduct.  Further,

her reports to the Union corroborate her claims that the conduct was unwelcome.

Axel further argues that the alleged harassment by Maas and Peschel was

not based on sex, but concedes the record contains evidence that Maas made

comments facially connected to her sex – the statement that women shouldn't be

doing a man's job and that no one wanted to work with Plaintiff because she is a

woman.  Further, Plaintiff asserts that Maas's hostility toward her – refusing to

add report her time, refusing to answer work questions, and shunning her –

contributed to a hostile work environment, and that Maas's conduct was directed at her because she was a woman.  While Axel argues that Maas treated all employees that way, Axel has presented no evidence that Maas refused to report male worker's time or refused to give them direction.  Based on this record, there are fact questions as to whether the allegedly harassing conduct by Maas was based on sex.

Axel further asserts that the alleged conduct by Hayes took place on five days spread out over three years, therefore she cannot demonstrate the allegedly harassing conduct was severe or pervasive.

As set forth above, the standard under both Title VII and the MHRA is whether a reasonable person could find the alleged behavior objectively abusive or offensive, and that Plaintiff actually perceived the conduct as abusive. Further, exposure to harassing conduct need not be continuous in order to have been pervasive.  See Hathaway v. Runyon, 132 F.3d 1214, 1222-23 (8th Cir. 1997) ("A work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it "into a series of discrete incidents.")

Here, Plaintiff has presented sufficient evidence upon which a reasonable jury could find the alleged behavior was objectively abusive or offense.  Plaintiff alleges Hayes's made numerous offensive statements, such as asking to see her tits, or if she wanted to see "his bulge" and suggesting sexual activity in a back room at a work site.  The Court also keeps in mind that during the relevant time period, Plaintiff was either the only female working on job sites, or one of two females.  That the alleged statements were made under such conditions supports Plaintiff's claims the statements were offensive and intimidating.  Plaintiff  has also alleged that Hayes engaged in physically intimidating conduct and it is undisputed that Hayes was much larger than Plaintiff.  (Lienemann Decl., Ex. 8 (Perron Dep. at 76, 88-89).)  Plaintiff alleges that Hayes repeatedly pushed her and tore tools out of her hand while calling her names like "dumb bitch."  (Id., Ex. 11 (Schroeder Dep. at 21, 123-24, 193), Ex. 12.)

The record also demonstrates that Plaintiff actually perceived this conduct as abusive and reported these feelings to both Peschel and the Union.

There are also fact questions as to whether Axel properly investigated Plaintiff's claims of harassment and took prompt remedial action to stop the alleged harassment.  It is undisputed that Plaintiff was assigned to job sites with

Hayes after she reported the alleged harassment.  Plaintiff alleges that Hayes was

abusive during those occasions.  She has also alleged that she was subjected to a

hostile work environment by her co-workers when it became known that she

reported Hayes.   Plaintiff's boyfriend also testified that he quit his job at Axel

because of the way Peschel handled the situation, which created a hostile work

environment for him.  (Id. Ex. 4 (Friebel Dep. at 77-78).)  Based on the record

before it, the Court finds that fact issues remain as to whether Axel took

sufficient remedial actions to ensure Plaintiff did not work in a hostile

environment.

### B.    Retaliation Claims

To establish a prima facie case of retaliation, Plaintiff must prove 1) that

she engaged in protected conduct; 2) a reasonable employee would have found

the retaliatory actions materially adverse; and 3) the materially adverse action

was causally linked to the protected conduct.  Musolf v. J.C. Penney Co., Inc., 773

F.3d 916, 918 (8th Cir. 2014).  The analysis is substantially the same for a claim

under the MHRA.  Dietrich v. Canadian Pacific Ltd., 536 N.W.2d 319, 327 (Minn.

1995).  To be materially adverse, the alleged retaliatory conduct "must be

sufficiently adverse to have created a material change in the employment, 'such

as a change in salary, benefits or responsibilities.'"  Henthorn v. Capitol

Comm'ns., Inc., 359 F.3d 1021, 1028 (8th Cir. 2004)(citations omitted).

The allegedly retaliatory acts fall into two categories: her allegations of

mistreatment and her alleged termination.  Because Plaintiff has not produced

any direct evidence of retaliation, the McDonnell Douglas burden shifting

analysis must be applied.  Musolf v. J.C. Penney Co., Inc., 773 F.3d 916, 918 (8th

Cir. 2014).  Thus, if Plaintiff establishes a prima facie case, the burden shifts to the

employer to articulate a legitimate, non-retaliatory reasons for the adverse action.

Id.  The burden then shifts back to Plaintiff to rebut the proffered reason with

evidence that it is pretext for retaliation.  Id at 919.

Axel has articulated a number of legitimate and non-retaliatory reasons for

the alleged adverse actions suffered by Plaintiff.  The burden thus shifts to

Plaintiff to rebut these proffered reasons with evidence of pretext.  The Court

finds that on the record before it, fact issues preclude summary judgment on this

claim as well.

Proof that the employer's proffered reason is unworthy of credence

permits the trier of fact to reasonably infer that the employer is covering for

retaliation.  See Hoover v. Norwest Private Mortg. Banking, 632 N.W.2d 534, 545-

46 (Minn. 2001).  Plaintiff asserts she did not quit her job at Axel, and that she

found other work only after she was not called back to Axel after making

repeated calls and sending multiple texts to Perron in early 2019.  (Lienemann

Decl., Ex. 11 (Schroeder Dep. at 57-58; Schroeder Decl. at ¶ 14.)  She has further

produced evidence demonstrating that the timing of her alleged termination

follows close in time to Peschel's communication with Chris Schmidt in

December 2018 – the former fiancé of her sister who falsely told Peschel that

Plaintiff used drugs at work and of making up the sexual harassment claims.

Plaintiff asserts that Peschel never followed up with Plaintiff about Schmidt's

accusations to determine the veracity of Schmidt's claims.  Instead, Axel never

called Plaintiff back to work.

　　　　Evidence that gives rise to an inference of a retaliatory motive is sufficient

to prove a causal connection between the protected conduct and the adverse

employment action.  Kipp v. Missouri Highway and Transp. Comm'n, 280 F.3d

8893, 897 (8th Cir. 2002).  Here, evidence that Peschel did not investigate the

claims of Chris Schmidt against Plaintiff, together with the evidence she was not

called back to work for Axel in the spring months of 2019, is sufficient to support

an inference of a retaliatory motive that must be decided by a jury.  Further,

Axel's claims that Plaintiff was not immediately called back to work in the spring of 2018 because she was not as skilled as other workers is also a fact question for the jury.

Finally, as with her claims of sexual harassment, there are fact questions as to whether Axel contributed to a hostile working environment for Plaintiff following her report against Hayes by continuing to assign her to work with Hayes and by failing to prevent abusive conduct by other coworkers – in retaliation for Plaintiff's complaint against Hayes.  Accordingly, summary judgment is not appropriate as to Plaintiff's claims of retaliation.

**IT IS HEREBY ORDERED** that Defendant Axel H. Ohman, Inc.'s motion for summary judgment (Doc. No. 28) is **DENIED**.

Date:  February 4, 2021

s/Michael J. Davis
Michael J. Davis
United States District Court